IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MISSOURI PARKS ASSOCIATION ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. CV 07-2233 |
| ) | |
| FEDERAL ENERGY REGULATORY ) | |
| COMMISSION, et al. ) | |
| ) | |
| Defendants. ) | |

## UNION ELECTRIC COMPANY'S REPLY
## IN SUPPORT OF ITS MOTION TO DISMISS

Defendant Union Electric Company d/b/a AmerenUE ("AmerenUE"), by its counsel,

submits the following Reply in Support of its Motion to Dismiss for Lack of Subject Matter

Jurisdiction the action filed by Plaintiff Missouri Parks Association ("MPA").

## BACKGROUND

MPA concedes the facts averred in AmerenUE's Statement of Points and Authorities in

Support of its Motion to Dismiss ("Statement"),[1] including most notably that MPA was an active

participant in the proceedings at FERC: "MPA did participate in the administrative process,"[2]

and MPA admits that this Complaint seeks the same relief based on the same issues that were

raised, considered, and addressed in FERC's December 20, 2007 Order on Rehearing

("December Order").  Indeed, MPA proclaims that it "timely plac[ed] before FERC the issues it

raises in this suit."[3]  MPA similarly agrees that FERC's December Order is a final action

---

[1] *See* Statement at 3-7.  Defined statutes, agencies, words and phrases identified in the Statement are incorporated
herein by reference.
[2] MPA Statement of Points and Authorities in Opposition to Union Electric Company's Motion to Dismiss
("Opposition"), at 4 (emphasis added).
[3] *Id.*

reviewable pursuant to Section 313 of the Federal Power Act, which provides for exclusive review by a federal **appellate** court.[4]

Despite these concessions, MPA continues to reject the exclusive, statutorily-defined method for review of FERC decisions in favor of unprecedented *de novo* review by this court of environmental issues in piecemeal, even while FERC continues overseeing the totality of environmental issues arising out of the Taum Sauk project.  MPA's Opposition not only offers no precedent supporting this court's review of FERC actions, it seeks to establish an ad hoc and unworkable judicially-created doctrine of federal district court involvement in select phases of federal agency decision making.  The court should dismiss MPA's Complaint.

## ARGUMENT

### I.      MPA Identifies No Precedent Supporting its District Court Complaint.

The essence of AmerenUE's Motion to Dismiss is that Section 313 of the Federal Power Act, 16 U.S.C. § 825l, provides the exclusive means for an aggrieved party to challenge FERC orders.[5]  AmerenUE noted in its Statement that no reported case has ever allowed a party to challenge a FERC order via a NEPA/APA action brought in federal district court.  Statement at 14.  In its Opposition, **MPA concedes that it has been unable to find a single instance where a federal district court entertained jurisdiction over a NEPA/APA challenge to a FERC decision**.  Opposition at 5-6.

Without precedent to support it, MPA seeks refuge for its Complaint in this court by claiming that it is not challenging "any violation of the Federal Power Act," which it concedes

---

[4] Opposition at 2-3.  Section 313 of the Federal Power Act ("FPA"), 16 U.S.C. 825l(b), provides, in pertinent part: "Any party to a proceeding under this Act aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order in the Circuit Court of Appeals of the United States…"  Such an appeal may yet be brought by other parties in the proceeding who have abided the statute.
[5] *City of Tacoma v. Taxpayers of Tacoma*, 357 U.S. 320, 336 (1958) (FPA Section 313 is "the exclusive mode for judicial review of the Commission's orders.").

must be brought pursuant to Section 313, but rather that it claims only "violations of the National

Environmental Policy Act" made by FERC in the FERC Proceeding. *Id.* at 6. MPA makes the

complicated argument that it is challenging FERC's "final agency action" of August 14, 2007,

*i.e.,* the final Environmental Assessment ("EA") and the Finding of No Significant Impact

("FONSI"), but that it is not seeking review of FERC's "final" December Order or, in fact,

review of "any other FERC order." *Id.* at 2. MPA's distinctions are without merit. The general

judicial review provisions in the APA that MPA relies upon do not supplant the specific

provisions Congress established in specific statutes, including the Federal Power Act. *See*

*Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988) ("Congress did not intend the general grant

of review in the APA to duplicate existing procedures for review of agency action.... [Section]

704 does not provide additional judicial remedies in situations where the Congress has provided

special and adequate review procedures."); *see also Darby v. Cisneros*, 509 U.S. 137, 153

(1993).

Section 313 of the Federal Power Act provides the exclusive judicial review process of

review for parties aggrieved by a FERC order of all issues contained in the order, not simply

review of only those objections that are premised upon alleged violations by FERC of the

Federal Power Act. MPA offers no precedent for its limited reading of Section 313, and in fact

there is none. Further, MPA provides no compelling reason for this court to create such

precedent when the remedies of Section 313 are available to MPA regarding a proceeding in

which it concedes it actively participated. Opposition at 4.

## II.    MPA's Claim That The August 14 Order Is Final Agency Action Is Irrelevant.

MPA concedes that the FERC December Order "appears to be a final order within the

provisions of § 313(b)." Opposition at 2, n.1; 3, n. 3. Unable to articulate why it has not

appealed that final order and sought a complete and orderly review of all issues, including environmental ones, pursuant to Section 313 before an appropriate federal appellate court, MPA strikes upon the notion that it was permitted to file for judicial review in this district court as soon as FERC completed its NEPA proceedings, *i.e.,* a "final agency action."  MPA argues this final agency action occurred on August 14, 2007, when FERC released its EA and FONSI regarding the Taum Sauk rebuild.  Opposition at 3.  Even if MPA is correct, and the EA and FONSI are final FERC actions, MPA points to no precedent to support its contention that these final FERC orders/actions are not still subject to the review procedures specified in Section 313.

To be sure, MPA points to no precedent allowing a party to do what it seeks to do here: seek judicial review (at any level) of an alleged FERC action in advance of the filing of a final FERC order.  Similarly, MPA provides no compelling reason why it sought to seek judicial review in advance of FERC's December Order.  Urgency or a sense of an imminent harm is not at issue; MPA's Complaint for injunctive relief did not even include a petition for preliminary injunctive relief required for same by the court's rules, *see* Local Rule 65.1, and MPA waited almost four months to file its Complaint.  Instead, MPA offers a few cases inapposite to FERC proceedings wherein litigants brought NEPA/APA actions after final agency actions were taken.

### A.      *Ohio Forestry Association, Inc. v. Sierra Club*

MPA draws the court's attention principally to dicta found in *Ohio Forestry Association, Inc. v. Sierra Club*, 523 U.S. 726 (1998).  In *Ohio Forestry*, the United States Supreme Court addressed issues related to a review of plans regarding logging in national forests pursuant to the National Forest Management Act ("NFMA").  Notably, the NFMA contained no mandatory and exclusive mechanism for judicial review of the Forest Service's orders as is found in Section 313 of the Federal Power Act and the Federal Power Act was not at issue.

The Sierra Club challenged, pursuant to NFMA and NEPA/APA, the initial logging determinations made by the Forest Service. *Id.* at 731. Similar to MPA's claims in this action, the Sierra Club wanted determinations from a district court that the Forest Service's initial logging determinations were unlawful and sought declaratory and injunctive relief preventing future logging without additional consideration of environmental harm. The District Court disagreed with the Sierra Club, finding the Forest Service's determinations lawful and granting it summary judgment. *Id.* at 732, *citing Sierra Club v. Robertson*, 845 F.Supp. 485, 503 (S.D. Oh. 1994). On appeal, the Sixth Circuit disagreed on the merits with the district court and found that the matter was ripe for review. *Id., citing Sierra Club v. Thomas,* 105 F.3d 248, 250 (6th Cir. 1997). The Supreme Court granted certiorari to determine if the controversy was ripe. Rejecting the Sixth Circuit's holding, the Court unanimously vacated and remanded the decision of the Sixth Circuit Court of Appeals, finding the controversy not to be justiciable.[6]

MPA does not rely upon *Ohio Forestry* for its holding or for any determination that Section of 313 of the Federal Power Act permits a NEPA/APA challenge in federal court; indeed *Ohio Forestry* involved a wholly different statutory regime. Rather, MPA cites the case for its dicta stating that a NEPA claim is ripe at the time the agency violates NEPA. *Id.* at 737 ("a person with standing who is injured by a failure to comply with the NEPA procedure may

---

[6] Although *Ohio Forestry* involved issues of ripeness that are tangential to AmerenUE' motion to dismiss, the Court articulated three factors as to why the Sierra Club's challenge was unripe, each of which is instructive in this case. First, the Court found no actual or imminent harm: "the Plan does not give anyone a legal right to cut trees, nor does it abolish anyone's legal authority to object to trees being cut." *Id.* at 733. In this case, as MPA concedes in its Complaint, Complaint, ¶ 28, the Taum Sauk project remains subject to a full re-licensing process and additional comprehensive environmental analysis once a re-license application is filed. Second, the Court found that "[h]earing the Sierra Club's challenge now could thus interfere with the system that Congress specified for the agency to reach forest logging decisions." *Id.* Congress provided via the Federal Power Act the exclusive process by which FERC orders are to be reviewed. Third, the Court refused to allow the lower courts to enter into the "time-consuming judicial consideration of the details of an elaborate, technically based plan," with broad effects. *Id.* at 736. Moreover, because the various levels of review were not complete at the Forest Service, the Court found that "depending on the agency's future actions to revise the Plan or modify the expected methods of implementation, review now may turn out to have been unnecessary." *Id.* This court should not delve into similar technical issues or hinder the ability of FERC to revise or modify its on-going environmental assessments regarding the Taum Sauk project.

complain of that failure at the time the failure takes place"). The Court did not explain how and where a NEPA challenge should be brought, however, and it explicitly rejected the contention that any failure to comply with NEPA had occurred in that case. In short, *Ohio Forestry* provides no support for MPA's filing of its action in this court instead of appealing to a Circuit Court.[7]

B.    ***Aberdeen & Rockfish R. Co. v. Students Challenging Regulatory Agency Procedures***

MPA also relies heavily on *Aberdeen & Rockfish R. Co. v. Students Challenging Regulatory Agency Procedures*, 422 U.S. 289 (1975), for the proposition that FERC's issuance of an environmental assessment constituted a final agency action that permits a challenge in this court even before a final FERC order issued. *Aberdeen*, however, is inapposite.

In *Aberdeen*, several railroad companies, the United States government, and the Interstate Commerce Commission (ICC) appealed the determination by a federal district court (sitting as a three-judge panel) to set aside an ICC general revenue determination, which environmental groups alleged did not contain sufficient environmental analysis. *Id.* at 298. Appellants raised jurisdictional and procedural considerations, both of which are instructive in this case.

First, appellants claimed that the district court erred in considering the environmental challenges because precedent indicated that such "general revenue proceedings are unreviewable." *Id.* at 316. The Court disagreed, finding that because the ICC's processes left no forum for a challenge to the environmental aspects of the ICC decision, a district court challenge

---

[7] MPA cites several cases that reference or adopt the dicta in *Ohio Forestry*. Opposition at 3. None of the cases address, much less permit, a NEPA/APA challenge of a FERC order in a federal district court. Similarly, the cases cited, such as *Sierra Club v. U.S. Army of Corps of Engineers*, 446 F.3d 808 (8th Cir. 2006), involved immediate district court review because no substantive or organic statute provided for judicial review of the agency's actions so there was "no other adequate remedy in a court." *See* 5 U.S.C. § 704. Finally, the cases regard whether an agency action is ripe for judicial review. AmerenUE does not dispute the ripeness of an appeal of FERC's decision to authorize reconstruction; it disputes the jurisdiction of this court to hear such an appeal in light of Section 313 of the Federal Power Act.

may be required to allow NEPA issues to be reviewed. *Id.* at 318-19 ("relief sought by and granted by the court below could not have been obtained from the ICC in a subsequent [] proceeding").[8]

The Court's jurisdictional holding in *Aberdeen* illustrates the fallacy of MPA's argument that it was required to file its NEPA/APA claims in this court. Unlike the environmental groups in *Aberdeen* that had no explicit judicial review forum for the environmental issues addressed in the ICC's general revenue proceedings, Section 313 provides express review for MPA's environmental claims. MPA could have sought to intervene and request rehearing of the EA and FONSI issuances or appellate review of the December Order. MPA's refusal to use these available forums does not create jurisdiction in this court.

Second, the *Aberdeen* Court considered the argument of appellants that, although environmental issues were only a part of the general revenue proceeding, they were, in fact, given additional and considerable consideration in another proceeding. The Supreme Court agreed, noting that the ICC was "giving continuing and more extensive attention to environmental consequences…in another proceeding, which was more appropriate to the task." *Id.* at 322. The Court found the point compelling: "no purpose could have been served by ordering [the ICC] to thoroughly explore the question in the confined and inappropriate context of a railroad proposal for a general rate increase when it was already doing so in a more appropriate proceeding." *Id.* at 325. Thus, the Court held that "[a] review of the record discloses that environmental issues pervaded the proceeding," and reversed the district court's decision to

---

[8] Appellants did not ultimately claim, as MPA alleges, "that a decision of the Interstate Commerce commission was an interim decision not subject to judicial review in the District Court." Opposition at 4. As the Supreme Court notes: "Although the railroads claim that a general revenue proceeding is an interim proceeding…for ratemaking purposes, they do not claim that is has a similar status for NEPA purposes. All parties now agree that a general revenue proceeding is itself a 'major federal action'…requiring its own final environmental impact statement so long as the proceeding has a substantial effect on the environment. This conclusion is clearly correct." *Aberdeen*, 422 U.S. at 318-19.

order the ICC to undertake a new environmental impact statement.  As noted above, FERC's

environmental review here was comprehensive and its environmental oversight is continuing.[9]

In short, *Aberdeen* has nothing to do with the Federal Power Act or a FERC proceeding

and the case's discussion of what constitutes a "federal action" is not in dispute.  The difference

here is that there are no "notions of finality and exhaustion" standing "in the way of judicial

review" of FERC's actions, *see id.* at 319, and that the FPA, unlike the statutes at issue in

*Aberdeen*, explicitly provides for judicial review of FERC's action – in a Circuit Court.

**III.    The December 20, 2007 FERC Order is Reviewable in Federal Appellate Court.**

As noted above, MPA concedes that the December Order is a final order as contemplated

by Section 313.  Opposition at 2, n.1; 3, n. 3.  Thus, MPA concedes that the issues raised in the

FERC Proceeding, and as articulated in the FERC Order, are now subject to judicial review—by

an appropriate federal *appellate* court.  Further, MPA concedes that the issues it raises in its

Complaint are the same as those it raised in the FERC Proceeding.  *See id.* at 4 (noting its

participation in the FERC Proceeding and the fact that it placed before FERC "the issues it raises

in this suit."); *see also* Statement at 7-8, n. 12 (setting forth similarities in all counts of the

Complaint compared to matters raised by the Coalition at FERC).  Thus, review of MPA's

claims properly lies in an appropriate Circuit Court.

AmerenUE agrees with MPA that FERC's December Order is a final order subject to

appellate review under Section 313.  An appeal of that order to a Circuit Court would be ripe,

---

[9] FERC undertook a thorough examination of the environmental considerations involved in determining whether to approve the rebuild of the Taum Sauk dam.  *See* Statement at 3-7 (noting an extensive process that involved multiple rounds of engineering design and review, a detailed environmental assessment, public comments, public meetings, and involvement by several outside parties, including MPA).  Moreover, FERC's environmental oversight is on-going.  Issues of pre-licensing of the Taum Sauk project already are before FERC.  On January 17, 2008, for example, FERC sent to AmerenUE a twelve-page analysis of AmerenUE's draft license application.  FERC staff performed a review of the draft license application pursuant to Part 16 of FERC's Rules, 18 C.F.R. § 16.8, and "pursuant [to] the National Environmental Policy Act" (emphasis added).  The letter requests from AmerenUE a litany of additional items necessary to establish the environmental safety of the project.  A true and correct copy of the letter is appended hereto as **Exhibit A**.

appropriate and timely.  Such an appeal also would allow for ultimate review of all potential issues related thereto, not simply the environmental issues MPA raised in its Complaint.  Indeed, a comprehensive review by a single appellate court of all issues raised before FERC on rehearing is preferable to piecemeal review by this court of environmental issues singled out by individual litigants at the same time that a federal appellate court potentially reviews those and all other issues.

Given MPA's concession that it has available to it an appropriate and available forum for the hearing of its grievances, this Court should not countenance MPA's attempt to end-run the exclusive review provisions of Section 313 of the Federal Power Act.

## CONCLUSION

WHEREFORE, AmerenUE respectfully requests that this Court dismiss with prejudice

MPA's Complaint for Declaratory, Injunctive and Other Relief.

Respectfully submitted,


_____/s/_____

Charles A. Zdebski
Clifford S. Sikora
TROUTMAN SANDERS LLP
401 Ninth Street, NW, Suite 1000
Washington, DC 20004-2134
(t) 202.274.2950
(f) 202.654.5632
(e-mail) charles.zdebski@troutmansanders.com

## CERTIFICATE OF SERVICE

I, Charles A. Zdebski, hereby certify that a copy of the foregoing Reply was served this

15th day of February 2008, by mailing a true copy thereof to:

>   Kathleen G. Henry
>   Great Rivers Environmental Law Center
>   705 Olive Street, Suite 614
>   St. Louis, MO 63101-2208
>
>   Federal Energy Regulatory Commission
>   Robert Solomon, Solicitor
>   888 First Street, NE
>   Washington, DC 20426


>   _____/s/_____
>   Charles A. Zdebski
>   TROUTMAN SANDERS LLP
>   401 Ninth Street, NW, Suite 1000
>   Washington, DC 20004-2134
>   (t) 202.274.2950
>   (f) 202.654.5632
>   (e-mail) charles.zdebski@troutmansanders.com

FEDERAL ENERGY REGULATORY COMMISSION
WASHINGTON, D.C. 20426
January 17, 2008

OFFICE OF ENERGY PROJECTS

Project No. 2277-000--Missouri
Taum Sauk Hydroelectric Project
Ameren/UE

Mr. Thomas L. Hollenkamp, P.E., S.E.
Chief Dam Safety Engineer
AmerenUE
One Ameren Plaza
1901 Chouteau Avenue, P.O. Box 66149
St. Louis, MO  63166-6149

Dear Mr. Hollenkamp:

Thank you for providing us with a copy of the draft license application for the
Taum Sauk Project.  We appreciate the opportunity to review the draft application, and to
provide you with our comments.

The draft application meets the requirements for a draft license application, as
described in §16.8(c)(4) of the Commission's regulations.  However, additional work is
needed to (a) define the geographic scope of project effects, and (b) identify the
environmental effects associated with continued project operations.  As requested, we are
providing you with our specific comments on the draft application in attachment A,
arranged according to exhibits and sections within the exhibits.  You should forward
these comments to the stakeholders, as appropriate.

In your draft license application, you identify the need to undertake several studies
to better refine the existing environment for the project since the breach of the upper
reservoir.  As we discuss in our comments, the studies will need to be completed before
we can complete our environmental review pursuant the National Environmental Policy
Act.  Therefore, you should finalize your study plans and conduct the studies in an
expeditious manner.  If any of your proposed studies can be conducted during the rebuild



EXHIBIT

A

–2–

period and before commercial operation commences, you should adopt such a schedule in the final study plans.

We hope you find these comments useful, and we look forward to further consultations and involvement in the relicensing process for the Taum Sauk Project. If you have any questions regarding these comments, please call me at (202) 502-8365.

Sincerely,


Allan E. Creamer
Project Coordinator


Enclosure:    Attachment A

cc:    Mr. Michael O. Lobbig
       Managing Supervisor Hydro Licensing
       One Ameren Plaza
       1901 Chouteau Avenue
       P.O. Box 66149, MC 600
       St. Louis, MO  63166-6149

       Mr. John Tarbell
       Devine Tarbell & Associates, Inc.
       970 Baxter Boulevard
       Portland, ME  04103

Attachment A
Project No. 2277

## COMMENTS ON DRAFT LICENSE APPLICATION
## FOR THE TAUM SAUK PROJECT

GENERAL COMMENTS

1.    In your draft license application, you identify three fishery studies and two
      vegetation studies that need to be completed to better refine the existing
      environment for the project since the breach of the upper reservoir.  You also
      discuss efforts to develop a water management plan for the project.  We discuss
      these study plans in more detail in our specific comments below, and identify
      areas where modifications to your proposed study plans, or new studies, may be
      necessary to adequately describe the existing conditions at, and any effects
      associated with the continued operation of, the project.  The resulting study reports
      will need to be filed before we can complete our environmental review pursuant
      the National Environmental Policy Act (NEPA).  For this reason, you should
      finalize the study plans and file them with your final license application, as well as
      conduct the studies and file the study reports in an expeditious manner.  If any of
      the studies to be conducted can be undertaken during the rebuild period for the
      upper reservoir and before commercial operation commences, you should adopt
      such a schedule in the final study plans.

2.    There is little, if any, mention of the East Fork Black River downstream from the
      Taum Sauk Project in the draft license application.  As discussed in more detail
      throughout our specific comments on Exhibit E, this is an omission that needs to
      be corrected in the final license application.  Specifically, the geographic scope for
      the environmental review (*i.e.*, affected environment and project effects
      discussion) in the final license application should include, at a minimum, the
      segment of the East Fork Black River downstream to its confluence with the
      mainstem Black River.  The geographic scope should be determined based on the
      extent of project effects downstream.

3.    Based on our review of the draft license application, as well as other information
      filed in the relicensing proceeding, we conclude that there are some important
      environmental issues that have not been addressed.  For example, pictures in the
      draft application show areas of substantial erosion.  Yet, there is no discussion of
      this issue.  Also, you describe the need to develop a final water management plan
      for the Taum Sauk Project, including establishing an instream flow for the East
      Fork Black River downstream from the project.  Other than where you describe

Attachment A                                   –ii–
Project No. 2277

your proposal, flows in the river and the project's affect on the aquatic community in the river are not addressed. Finally, the draft license application ignores the issue of fish entrainment. We address these issues in greater detail below, in our specific comments, and conclude that they should be addressed in the final license application.

4.      Comprehensive Plans – Throughout Exhibit E and in Exhibit H of your draft license application, you describe, and assess consistency with, several state comprehensive plans. Please note that the list of comprehensive plans has been updated (August 2007). *See* http://www.ferc.fed.us/industries/hydropower/gen-info/licensing/complan.pdf. Please revise the appropriate sections and discussions accordingly. Also, you should consider federal plans as well as state comprehensive plans (*e.g.*, Fisheries USA, North American Waterfowl Management Plan, the Nationwide Rivers Inventory, any Forest Service plans, etc.). In addition, please provide a brief description of how the upper dam breach may have affected consistency with the comprehensive plans. Finally, you should account for the East Fork Black River downstream from the project in your review.

5.      The pictures of the lower reservoir provided in the draft license application show areas of extensive erosion along the shoreline, but this condition is not addressed anywhere in Exhibit E. There should be a Geology and Soils section added to Exhibit E. This section should focus on the project's affects, if any, on erosion and sedimentation in the project area and downstream in the East Fork Black River (*e.g.*, sedimentation associated with the Bin Wall, erosion and sedimentation associated with the dam beach, erosion alone the lower reservoir shoreline, etc.)

SPECIFIC COMMENTS

*VOLUME 1, INITIAL STATEMENT AND EXHIBITS A THRU E-8*

6.      On Page IS-3, last paragraph of section 5, you state that AmerenUE will file its request for water quality certification within 60 days of the Commission's acceptance notice. The Commission's regulations require the section 401 water quality certification application to be filed within 60 days of the ready for environmental analysis notice. This should be corrected in the final license application.

7.      On Page A-2 (Exhibit A – Project Description), second paragraph you describe the 30-mile-long transmission line licensed as part of the original project. You

Attachment A                          –iii–
Project No. 2277

indicate that AmerenUE, on October 11, 2007, filed a request that the Commission amend the existing license for the project to remove the transmission line from the license. This paragraph should be revised in the final license application to reflect the status or outcome of the amendment proceeding.

8.  On Page A-8 (Exhibit A), section 6.0, you describe the Pump-Generating Plant for the Taum Sauk Project. However, there is no mention of trashracks or other similar protective devise(s) at the project. There should be a statement in the final license application indicating whether there are any trashracks associated with the project. If so, the license application should include a description of this feature (*e.g.*, dimensions, clear bar spacing, "intake" velocities, etc.).

9.  On Page A-9 (Exhibit A), section 8.0, you indicate that AmerenUE is consulting with stakeholders to develop recreational enhancements that AmerenUE would propose in the final license application. Please ensure that any such enhancement is described in the license application (*e.g.*, describe the measure(s) to be implemented, show the location of any proposed facility on a map and describe its location relative to the project boundary, provide the cost of any proposed measure, describe who is responsible for construction, operation, and maintenance of any facilities, etc.). Also, you are encouraged to file a draft recreation plan (to include the aforementioned information, as well as specific erosion and sediment control measures to be implemented, if necessary, and a schedule for implementing the plan) with the final application.

10. On Page A-9 (Exhibit A), section 9.0, you state that AmerenUE is in the process of finalizing the design and proceeding with an upgrade of water volume control system.[1] You state that this system will be in place and operational prior to the submittal of the final license application. Please be sure this section is updated as part of the final license application. The license application should describe this system in detail. You should document this system in a draft project operations and flow monitoring plan, or as a component of the Water Management Plan described in Exhibit B – Project Operations and Resource Utilization. Either plan should include (a) consultation with agencies and other stakeholders, as appropriate, (b) any costs associated with implementing the plan, including on-going operations and maintenance, and (c) a schedule for implementing the plan, including filing of any operational reports with the Commission and agencies.

---

[1] The volume control system controls the water in the upper and lower reservoirs and the flow to the East Fork Black River downstream from the project during all phases of project operation.

Attachment A                              –iv–
Project No. 2277

11.    On Pages B-12 to B-15 (Exhibit B – Project Operations and Resource Utilization),
       you include several figures that describe specific features of the upper and lower
       project reservoirs, as well as the East Fork of the Black River (Figures B-1 to B-6).
       Please provide this same information in tabular format, as well.

12.    On Pages B-20 and B-21 (Exhibit B), section 4.2, you describe a Project
       Operations Water Management Plan that you propose to file within 6 months of
       restart of project operations following completion of the upper reservoir rebuild.
       To the extent practical, you should file this plan, as an interim plan, with your
       final license application. You should expand this plan (provided in Appendix B-5)
       to include a historical discussion of the issues associated with water management
       at the project and in the East Fork Black River downstream from the project. This
       information is needed to provide context for the plan. You should file the proposed
       final water management plan within 6 months of restart of project operations.

13.    On Page B-21 (Exhibit B), section 4.3, you outline a Gravel and Sedimentation
       Control Program for the Taum Sauk Project. You indicate that this plan would be
       prepared upon issuance of a new license for the project. We recommend that you
       file a draft of this plan with your final license application.

14.    In Appendix B-2 (Exhibit B), you include the annual and monthly flow duration
       curves for the lower reservoir dam. Please provide this same information in
       tabular format, as well.

15.    On Pages C-3 and C-4 (Exhibit C – Project History and Schedule of Proposed
       Improvements), you briefly describe the rebuild effort for the Taum Sauk upper
       reservoir. Please provide a detailed schedule of the rebuild effort in this exhibit.

16.    On Pages D-3 to D-5 (Exhibit D – Project Costs and Financing), you include
       sections for (a) fair market value (section 3.1), (b) net investment (section 3.2), (c)
       severance damages (section 3.3), (d) annual cost of the project (section 5.0), and
       (e) annual value of power (section 7.0). You indicate that AmerenUE is in the
       process of determining these costs. These sections should be revised in the final
       license application to include the costs associated for each of the items described.

17.    On Page D-4 (Exhibit D, section 4.0), you indicate that AmerenUE has not
       identified any environmental enhancements, or corresponding costs, at this time.
       You indicate that once the proposed additional studies are completed this section
       would be updated. To the extent possible, you should revise this section to

Attachment A                          –v–
Project No. 2277

include the costs for any known proposed environmental measures at the time the license application is filed. Exhibit D, section 4.0, should be supplemented with proposed environmental measures and costs when the final reports from those studies are filed with the Commission.

18.  On Page D-5 (Exhibit D, section 6.0), you discuss the cost to prepare the license application. You indicate that AmerenUE will provide an estimate of these costs with the final license application. This section of Exhibit D in the final license application should be revised accordingly. In addition, the cost to prepare the application should include an estimate for all pre-license studies to be undertaken.

19.  Section 8.0 (Page D-5 of Exhibit D) of the final license application should be revised to provide information on the sources and extent of financing to support AmerenUE's proposed project operation and other environmental measures.

20.  In Exhibit E (General Description of Locale), there should be some description of how the breach of the upper reservoir altered the landscape we now know as the existing environment.

21.  On Page E2-5 (Exhibit E – General Description of Locale), in section 2.3.3, you described two seismic events that occurred at the project. As part of this discussion, please indicate whether there was any damage to the project or changes to the environmental setting associated with either event.

22.  On Page E2-6 (Exhibit E), you generally characterize the wetlands in the project area. This description should include a mention of those wetlands created as a result of the leakage associated with the upper reservoir. The effects of eliminating or reducing that leakage should be addressed in Exhibit E5, as part of your assessment of project effects on wetlands and other aquatic vegetation.

23.  On Page E3-6 (Exhibit E – Water Use and Quality), section 3.3.1, you mention sections 305(b) and 303(d) of the Clean Water Act, and the requirements associated with those sections. Citing a 2005 Missouri report, you indicate that no waters of the project are listed as impaired under such provisions of the Clean Water Act. Please include information in the final license application on whether the breach of the upper reservoir led, or may lead, to any changes in Missouri's classification of project waters and in the Each Fork Black River.

Attachment A                          –vi–
Project No. 2277

24.    Exhibit E3, sections 3.3.2 (Water Quality) and 3.4 (Project's Effects on Water
       Quality), is lacking in that there is little, if any, information and discussion
       regarding how the breach of the upper reservoir affected pre-breach water quality
       in the East Fork Black River and lower reservoir.  You indicate that post-breach
       restoration monitoring studies are being conducted by MACTEC, a company
       retained by AmerenUE to undertake restoration activities associated with the
       breach.  This information will be important in describing potential project effects
       associated with the continued operation of the Taum Sauk Project.  Please revise
       these sections of the final license application to include relevant information from
       MACTEC's on-going monitoring studies.

25.    Section 3.5 (Exhibit E3) includes a summary of your proposed protection,
       mitigation, and enhancement measures.  You mention the need for a final water
       management plan, which you indicate would be filed within 6 months of restarting
       the project.  As noted in Comment #8, you will also need to develop a project
       operation and flow monitoring plan, either as a separate document or as a
       component of the final water management plan.  This monitoring requirement
       should be filed along with the license application or, alternatively, at the time the
       final water management plan is filed.  It is necessary to document compliance with
       project operations during the term of any new license issued for the project.

26.    On Page E3-23 (Exhibit E3, section 3.5.2), you indicate that the issue of elevated
       turbidity levels is being addressed as part of the on-going restoration efforts.  The
       scope of this issue is not clear.  Please clarify whether this statement applies to the
       East Fork Black River downstream from the project, as well as to the upstream
       segment of the river and lower reservoir?

27.    On Page E4-3 (Exhibit E4 – Report on Fish and Aquatic Resources), section 4.1,
       you indicate that proposed plans for studies to be conducted to refine the
       environmental baseline and assess project effects will be reviewed with relevant
       resource agencies prior to filing the final license application.  Any proposed study
       plans should be finalized and filed as part of the final license application.  These
       study plans should include a schedule for completion and filing final study reports
       with the Commission.  As we previously stated in Comment #1, you should
       conduct the studies in an expeditious manner, and, where appropriate, conduct
       studies during the rebuild period for the upper reservoir.

28.    Exhibit E4, sections 4.3 (Existing Fish and Aquatic Resources) and 4.4 (Project's
       Effects on Fish and Aquatic Resources), is lacking in several areas.  First, there is

Attachment A                                –vii–
Project No. 2277

no description of habitat conditions in the East Fork Black River downstream from
the project. Second, there is little, if any, information and discussion of
how the breach of the upper reservoir affected pre-breach fish and aquatic
resources in the lower reservoir and downstream in East Fork Black River. For
example, how has the habitat types/characterizations (section 4.3.1.1) and aquatic
vegetation (section 4.3.1.4) been altered as a result of the upper reservoir breach
and subsequent dredging activity? How has the East Fork Black River
downstream from the project been affected by turbidity and sedimentation
associated with the breach? How has the fish community in the lower reservoir
and East Fork Black River been affected by the breach and subsequent restoration
activities?

On Page E4-22 (Exhibit E, section 4.3.2.1), you indicate that fish salvage activities
for the lower reservoir were undertaken in July and August 2006. No other
information on post-breach affects on fish and aquatic resources is provided. Yet,
such information is important in describing potential project effects associated
with the continued operation of the Taum Sauk Project.

To the extent that any of the aforementioned information is currently available,
please expand sections 4.3 and 4.4 of Exhibit E4 in the final license application to
include such information. If this information, including information for the East
Fork Black River downstream from the project, is not available, your proposed
study plans should be revised, or new study plans developed, to gather the
information.

29.  Section 4.4 of Exhibit E4 (Pages E4-31 to E4-39) lacks in its description of the
     scope of environmental effects associated with the continued operation of the
     Taum Sauk Project. For example, there is no discussion of how the project affects
     aquatic habitat in the river downstream from the project. Any flow established for
     this segment of the river, as part of the final water management plan, will need to
     be supported by information in the record. A flow study may be needed to provide
     the requisite information to help assess the effects of any proposed flow for the
     river. Section 4.4 does not mention fish entrainment or passage needs at the
     project. This issue was identified by the Missouri Department of Conservation in
     its comments on the Initial Consultation Document (March 23, 2005). Also, how
     much littoral zone habitat in the lower reservoir is, or will be, dewatered at
     drawdowns of 2, 4, 6, 8, 10, 12, and 13.5 feet? NEPA requires that the
     Commission independently assess such issues and make a decision on appropriate
     enhancements for the project based on information in the record, as well as a

Attachment A                                   –viii–
Project No. 2277

reasoned, thorough review of the environmental effects associated with continued project operation. Thus, you should revise section 4.4 to include a discussion of the aforementioned issues, and provide supporting information.

30.    In section 4.5 (Exhibit E, Pages E4-39 to E4-41), you summarize protection, mitigation, and enhancement measures for fish and aquatic resources. In section 4.5.1, you mention on-going restoration efforts to address the effects associated with the upper reservoir dam breach. To fully understand the effect associated with the breach, please revise this section to include details of the restoration and recovery efforts. What activities have been undertaken to date? What activities are planned for the future? In section 4.5.1, you also talk about signs of recovery. To help us understand how recovery may be proceeding, you should describe the results of on-going monitoring and any other existing evidence that supports your statements. The reports and other documentation should be provided as part of the final license application.

31.    In section 4.5.2 (Exhibit E, Page E-4-41), you describe proposed measures to address project-related effects, including conducting three studies to refine the environmental baseline. You should revise this section in the final license application, as necessary, to describe any measures AmerenUE proposes for the East Fork Black River downstream from the project.

32.    On Page E5-3 (Exhibit E5 – Report on Wildlife and Botanical Resources), section 5.1, you indicate that proposed plans for studies to be conducted to refine the environmental baseline and assess project effects will be reviewed with relevant resource agencies prior to filing the final license application. Any proposed study plans should be finalized and filed as part of the final license application. These study plans should include a schedule for completion and filing final study reports with the Commission. As we previously stated in Comment #1, you should conduct the studies in an expeditious manner, and, where appropriate, conduct studies during the rebuild period for the upper reservoir.

33.    On Pages E5-23, E5-25, and E5-27 (Exhibit E5, sections 5.4.2 and 5.4.5), you characterize the bald eagle as a federally listed threatened species that is known to occur in the project area. The bald eagle was recently delisted (notice issued on July 9, 2007 [72 Fed. Reg. 37346], effective August 8, 2007), but remains protected by the Bald and Golden Eagle Protection Act and the Migratory Bird Treaty Act. You should revise these sections in the final license application, accordingly.

Attachment A                                –ix–
Project No. 2277

34.    Exhibit E5 does not include any discussion of the effects of continued project
       operation on wildlife and botanical resources in the project area or downstream or
       the project along the East Fork Black River.  To the extent possible, such an
       environmental assessment should be included in the final license application.  If
       the information necessary to complete this assessment, including that for the East
       Fork Black River downstream from the project, is not available, your proposed
       study plans should be revised, or new study plans developed, to gather the
       information.

35.    In section 5.5.1 (Exhibit E5, Page E5-29), you indicate that approximately 180
       acres of timber was affected by the breach of the upper reservoir.  Please delineate
       how much of the acreage is within the project boundary and how much is outside
       the boundary.  Also, if possible, you should describe what cover type(s) were
       affected.

36.    In the 2nd paragraph of section 5.5.1 (Exhibit E5, Page E5-29), you indicate that
       ground covering riparian vegetation was covered by silt and sand from the beach.
       You also indicate that extensive areas of emergent vegetation have become
       established in some of those silted-in areas.  To help us better understand the
       effects of the beach and subsequent recovery of the area, please show the areas
       silted in and those showing signs of recovery with emergent vegetation on a map
       of the project area.

       In the last paragraph of this section you discuss restoration efforts and the effects
       associated with such efforts.  Please expand this discussion to describe any other
       restoration activities (*e.g.*, planting of trees and other vegetation along the river
       and lower reservoir, river channel restoration efforts, measures taken in the
       Johnson Shut-ins State Park, etc.).  This information will be important in any
       discussion of cumulative effects associated with aquatic and terrestrial resources.

       You also state in the last paragraph that access roads were constructed in and
       around the lower reservoir, and sediment disposal areas were developed, as part of
       the dredging/restoration activities for the reservoir.  Please describe the effects on
       land cover around the lower reservoir shoreline you mention in the last sentence of
       the paragraph.

37.    On Page E6-3 (Exhibit E6 – Report on Historical and Archeological Resources),
       section 6.2.1, you describe the Area of Potential Effects (APE) for the historic and
       archaeological resources studies as the property enclosed with the project

Attachment A                          –x–
Project No. 2277

boundary for the Taum Sauk Project. The APE should be defined as the area within the project boundary, as well as those areas outside the project boundary that may be either directly or indirectly affected the operation of the project. The definition of the APE in the final license application should be clarified, accordingly.

38.    In section 6.2.4 (Exhibit E6, Page E6-10), you indicate that the results of the combined Phase I and II study being conducted in 2007 will be included in the final license application. The results of the Phase I and II study should be summarized in the license application. The actual report(s) should be filed separately with the Commission's Secretary, as confidential or sensitive information. You should also send a courtesy copy to the project coordinator for this project at the following address:  Allan Creamer, Project Coordinator, Federal Energy Regulatory Commission, Routing Code PJ-14.2, Room 62-31, 888 First St., NE, Washington, DC 20426.

39.    Sections 6.3 and 6.4 in Exhibit E6 should be revised, as necessary in the final license application.

40.    On Page E7-6 (Exhibit E7 – Report of Recreational Resources), section 7.3.1, you describe the project's existing recreational facilities and other resources. In the final license application, please describe the current operating status of those facilities. For example, what project-related facilities are, and will remain, open to the public during the approximately 2-year construction period for rebuilding the upper reservoir dam?

41.    In section 7.3.2 (Exhibit E7, Page E7-6), you indicate that there are no federally designated Wild and Scenic River sites within the Taum Sauk Project boundary. In the final license application, you should explain whether any segments of the East Fork Black River upstream of, or downstream from, the project are similarly designated.

42.    In section 7.5 (Exhibit E7, Pages E7-30 to E7-34), you describe the project's existing recreation amenities. However, there is not explanation as to the current operating status of these facilities, nor is there any assessment as to the adequacy of these facilities in meeting current recreation use or future demand. In addition, there is no discussion of how project operation may affect recreational use and access to the lower reservoir and East Fork Black River downstream from the

Attachment A                                    –xi–
Project No. 2277

project. This section of Exhibit E7 in the final license application should be
revised to include this information.

43.    In section 7.6 (Exhibit E7, Pages E7-34 and E7-35), you describe the issues
identified in Missouri's Statewide Comprehensive Outdoor Recreation Plan
(SCORP) for the Southeast Missouri Region (includes the project area). However,
there is no discussion of how the proposed project would be consistent with the
SCORP. Please revise this section of the final license application, accordingly.

44.    In section 7.7 (Exhibit E7, Pages E7-35 and E7-36) you state that recreation
measures will be the subject of on-going consultation with the relicensing
stakeholders. Please be sure that this section of Exhibit E7 (Summary of
Protection, Mitigation, and Enhancement Measures) is updated in the final license
application.

45.    On Page E8-4 (Exhibit E8 – Land Management and Aesthetics), section 8.2.2, you
state that AmerenUE owns 100 percent of the project lands (2,364 acres) and
"hundreds of acres of non-project lands abutting the project boundary." Please
clarify what you mean by "hundreds of acres" in the final license application.
How much non-project land is owned by AmerenUE? You should show these
lands on the Exhibit G map(s) for the project. Also, on Page E8-5, you indicate
that MDC developed and maintained the lower reservoir boat ramp up to the time
of the upper reservoir breach. You should clarify in the final license application
the current operating status of the boat ramp and, if open to the public, who is
responsible for its operation and maintenance.

46.    Section 8.3.2 (Exhibit E8, Pages E8-14 and E8-15) is lacking in a couple of areas.
There is no description or assessment of the aesthetic experience related to project
operations (*i.e.*, daily water fluctuations and the fringe of shoreline dewatered with
such fluctuations). Also, there is little, if any, information and discussion of how
the breach of the upper reservoir affected the pre-breach aesthetic experience. For
example, how has the deforestation on Proffit Mountain, the damage to the East
Fork Black River and the lower reservoir, and restoration efforts associated with
the upper reservoir breach altered the aesthetic experience in the project area?

47.    In section 8.4 (Exhibit E8, Page E8-15) you state that land management and
aesthetic resource measures will be the subject of on-going consultation with the
relicensing stakeholders. Please be sure that this section of Exhibit E8 (Summary

Attachment A                                    –xii–
Project No. 2277

of Protection, Mitigation, and Enhancement Measures) is updated in the final
license application.

*VOLUME II, EXHIBIT H*

48.   Section 2.3, on Page H-9, talks about "Need, Cost, and Availability of Alternative
      Sources of Power." Please be sure this section is updated as part of the final
      license application.

49.   On Page H-12, you state, at the end of your discussion of the SCORP, that
      consistency with the plan will be determined once recreation measures are
      identified. Please be sure you revise this discussion as part of the final license
      application.

50.   On Page H-13, you state, in reference to the Missouri water quality basin plans,
      that "AmerenUE believes the project is consistent with the plans." We question
      how this statement can be made when the plans have not been reviewed.

51.   On Page H-27, you state, in section 3.7, that AmerenUE will include its estimate
      of the ownership and operating expenses for the Taum Sauk Project as part of the
      final license application. Please be sure you include this information in the final
      license application.

*VOLUME IV, EXHIBIT G*

52.   In section 2.0, Page G-4, you briefly describe the exhibit G map for the Taum
      Sauk Project. You make reference to AmerenUE-owned lands within and adjacent
      to the project boundary. As part of this discussion, you should specify the acreage
      of AmerenUE-owned land within, and adjacent to, the project boundary. In
      addition, the exhibit G map(s) should conform to 18 C.F.R. §§ 4.39 and 4.41
      (2007), including showing all project features (existing and proposed) on the map,
      relative to the project boundary. Finally, the Commission recently removed the
      Non-Internet Public designation for Exhibit G maps (*see* 121 FERC ¶ 61,107
      (issued October 30, 2007). Please refer to the following guidelines when
      preparing Exhibit G; http://www.ferc.fed.us/industries/hydropower/gen-
      info/guidelines/drawings_guide.pdf.