UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MISSOURI PARKS ASSOCIATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:07-cv-02233-RMC |
| | ) | |
| FEDERAL ENERGY REGULATORY | ) | |
| COMMISSION, and UNION ELECTRIC | ) | |
| COMPANY d/b/a AMEREN-UE | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |

MOTION OF DEFENDANT FEDERAL ENERGY REGULATORY
COMMISSION TO DISMISS COMPLAINT FOR LACK OF SUBJECT
MATTER JURISDICTION

Defendant Federal Energy Regulatory Commission hereby moves to dismiss

Plaintiff's Complaint in its entirety for lack of subject matter jurisdiction pursuant to

Federal Rule of Civil Procedure 12(b)(1), for the reasons set forth in the accompanying

memorandum of points and authorities.

Dated: March 10, 2008                    Respectfully Submitted,

```
/s/
JEFFREY A. TAYLOR,DC Bar # 498610
Assistant United States Attorney


/s/
RUDOLPH CONTRERAS, DC Bar # 434122
Assistant United States Attorney


/s/
KEITH MORGAN, D.C. Bar #422665
Assistant United States Attorney
```
United States Attorney's Office
555 Fourth Street, N.W.
Washington, D.C.  20530
Telephone: 202-514-7228
Facsimile:  202-514-8780
E-Mail: keith.morgan@usdoj.gov

Robert H. Solomon, Solicitor
Jeffery S. Dennis, Attorney
FEDERAL ENERGY REGULATORY
    COMMISSION
888 First Street, NE
Washington, D.C. 20426
jeffery.dennis@ferc.gov
(202) 502-6027

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MISSOURI PARKS ASSOCIATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:07-cv-02233-RMC |
| | ) | |
| FEDERAL ENERGY REGULATORY | ) | |
| COMMISSION, and UNION ELECTRIC | ) | |
| COMPANY d/b/a AMEREN-UE | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

MEMORANDUM IN SUPPORT OF DEFENDANT
FEDERAL ENERGY REGULATORY COMMISSION'S
MOTION TO DISMISS PLAINTIFF'S COMPLAINT

As Defendant Union Electric Company d/b/a Ameren UE ("Ameren") explains in its

Motion to Dismiss for Lack of Subject Matter Jurisdiction and accompanying Statement of

Points and Authorities, the complaint of Plaintiff Missouri Parks Association must be dismissed

for lack of subject matter jurisdiction.  The issues raised by Plaintiff in this     Court are the

subject of orders issued by Defendant Federal Energy Regulatory Commission ("FERC")

pursuant to its authority under the Federal Power Act ("FPA").  The FPA vests the Circuit

Courts of Appeals with exclusive jurisdiction to review such orders, and in fact, since the time

this Complaint was filed, Plaintiff has filed a Petition for Review in the United States Court of

Appeals for the 8th Circuit (No. 08-1390) of the subject FERC orders.  Accordingly, the

Complaint should be dismissed.

BACKGROUND

Ameren's memorandum accurately states the factual background of this case, which is also recounted in FERC's December 20, 2007 order denying rehearing in this case, *AmerenUE*, 121 FERC ¶ 61,270 (2007) ("Rehearing Order") (attached as Exhibit A). The Taum Sauk Pumped Storage Project, operated by Ameren, is a hydroelectric generating facility licensed by the Commission pursuant to the FPA. On December 14, 2005, the upper reservoir of the project breached, causing a failure of the project facilities that resulted in significant flooding and property damage. Following a FERC investigation, Ameren agreed to pay a $10 million civil penalty, and place $5 million into an escrow account to fund improvements to facilities at or near the project. *See* Rehearing Order at P 3.

On February 5, 2007, Ameren filed a request to rebuild the upper reservoir. After issuing a notice of intent to prepare an environmental analysis, the issuance of a scoping document, and two public hearings, FERC Staff issued a draft Environmental Assessment on June 7, 2007. After receiving public comments, a Final Environmental Assessment was issued on August 14, 2007. That document concluded that Ameren's proposal to rebuild the upper reservoir, with certain mitigation measures recommended by FERC Staff, would not constitute a major federal action significantly affecting the quality of the human environment. The next day, August 15, 2007, the Director of the Commission's Office of Energy Projects, acting pursuant to delegated authority, issued an order approving Ameren's request and authorizing it to begin reconstructing the upper reservoir. *See* Letter Order, FERC Docket No. P-2277 (Aug. 15, 2007) ("Letter Order") (attached as Exhibit B).

In response to the Letter Order, Missouri Coalition for the Environment, the Sierra Club, and American Rivers (but not Plaintiff) jointly filed a motion seeking late intervention in the FERC proceedings, and requesting agency rehearing of the Director's conclusions.  They argued that the Commission erred by limiting the scope of the Environmental Assessment only to the environmental impacts of Ameren's proposal to reconstruct the upper reservoir, and that it also should have considered the future impacts of the operation of the Taum Sauk project.  In particular, they argued that the Commission analysis was inadequate under the National Environmental Policy Act ("NEPA") because it did not evaluate the reasonably foreseeable impacts of operation of the project under both the existing operating license and any future license issued by the Commission.  *See* Rehearing Order at PP 10-11.[1]

The Commission rejected these arguments in the Rehearing Order, concluding that the scope of its Environmental Assessment was appropriate, and that its approval of the reconstruction of the upper reservoir of the project did not prejudice its ultimate decision on Ameren's request to relicense the project.  *Id.* at PP 12-16.

## ARGUMENT

Defendant FERC concurs in the arguments presented in the Statement of Points and Authorities submitted by Ameren in support of its Motion to Dismiss, and will not unnecessarily repeat those arguments here.

As Ameren correctly notes, Section 313(b) of the Federal Power Act ("FPA"), 16 U.S.C. § 825*l*(b), vests the Circuit Courts of Appeals with exclusive jurisdiction to review FERC orders.

---

[1] Ameren's license for the Taum Sauk project expires in 2010, and Ameren has announced its intent to seek a new license.

*See, e.g., City of Tacoma v. Taxpayers of Tacoma*, 357 U.S. 320, 335-36 (1958) (noting that 16 U.S.C. § 825*l* "prescribe[s] the specific, complete and exclusive mode for judicial review of the Commission's orders").  The orders issued in this proceeding (particularly the Rehearing Order) address the very same issues regarding the scope of FERC's Environmental Assessment that Plaintiff seeks to raise in this Court.

In fact, Plaintiff (along with Missouri Coalition for the Environment) has, subsequent to its Complaint and Ameren's Motion to Dismiss, filed a Petition for Review of those same FERC orders in the United States Court of Appeals for the 8th Circuit.  *Missouri Coalition for the Environment and Missouri Parks Association v. FERC*, 8th Cir. No. 08-1390 (filed Feb. 15, 2008).

In this situation, where Plaintiff seeks judicial review of issues in this Court at the same time it seeks judicial review in the Court of Appeals of FERC orders addressing the same issues, jurisdiction is exclusive with the Court of Appeals.  *See Public Utility Dist. No. 1 of Snohomish County, Washington v. FERC*, 315 F. Supp. 2d 89 (D.D.C. 2004).  In *Public Utility District*, the plaintiff asserted a violation of the Sunshine Act in a complaint before the District Court at the same time it sought administrative rehearing of the same issue before the agency, and later (after the agency ruled on rehearing) sought judicial review of the agency's decision on that issue in a Circuit Court of Appeals.  *Id.* at 92-93.  The Court found that it lacked subject matter jurisdiction.  Because the plaintiff's claim had "been presented to and considered by the FERC," the Court concluded that "plaintiff may seek judicial review of this claim *only* in the Court of Appeals."  *Id.* at 93 (citing in part *City of Tacoma*, *supra*).  In reaching this conclusion, the Court rejected plaintiff's "attempt[] to avoid th[e] jurisdictional limitation" of the FPA "by not

4

challenging the FERC's orders directly, but simply asserting that there was a Sunshine Act violation." *Id.* Additionally, the Court found that it lacked subject matter jurisdiction because of the "presumption against a circuit court and a district court exercising concurrent jurisdiction over a pending matter." *Public Utility District*, 315 F. Supp. 2d at 93-94; *see also Municipal Electric Utilities Ass'n of New York State v. Conable*, 577 F. Supp. 158, 163 (D.D.C. 1983) (noting presumption against concurrent jurisdiction).

For the same reasons, this Court should dismiss Plaintiff's complaint for lack of subject matter jurisdiction pursuant to Rule 12(b)(1). The issues Plaintiff seeks review of here have already been "presented to and considered by the FERC" in the Rehearing Order, and Plaintiff similarly seeks to avoid the jurisdictional limitations of the FPA by not directly challenging the FERC's order. *Public Utility District*, 315 F. Supp. 2d at 93. Plaintiff now seeks review of the same issues in both this Court and the United States Court of Appeals for the 8th Circuit. Because 16 U.S.C. § 825*l* grants "'specific, complete and exclusive'" jurisdiction over issues addressed in FERC orders to the Court of Appeals, *Public Utility District*, 315 F. Supp. 2d at 92 (quoting *City of Tacoma*, 357 U.S. at 335-36), and given the "presumption against a circuit court and a district court exercising concurrent jurisdiction over a pending matter," *Public Utility District*, 315 F. Supp. 2d at 93-94, the 8th Circuit has exclusive jurisdiction over the issues Plaintiff attempts to raise here.

Moreover, since Plaintiff has already availed itself of the exclusive statutory mode of review by filing (collectively with Missouri Coalition for the Environment) its Petition for Review in the 8th Circuit, Plaintiff will not be harmed by a dismissal of the instant complaint.

The 8th Circuit provides the appropriate forum to address the issues raised in the underlying FERC proceeding.

<u>CONCLUSION</u>

For these reasons stated herein, and for the reasons stated in Ameren's Statement of Points and Authorities, Defendant FERC respectfully requests that the Court dismiss the instant Complaint for lack of subject matter jurisdiction.

Dated:          March 10, 2008          Respectfully Submitted,


<u>/s/</u>
JEFFREY A. TAYLOR,DC Bar # 498610
Assistant United States Attorney

<u>/s/</u>
RUDOLPH CONTRERAS, DC Bar # 434122
Assistant United States Attorney

<u>/s/</u>
KEITH MORGAN, D.C. Bar #422665
Assistant United States Attorney
United States Attorney's Office
555 Fourth Street, N.W.
Washington, D.C.  20530
Telephone: 202-514-7228
Facsimile:  202-514-8780
E-Mail: keith.morgan@usdoj.gov

Robert H. Solomon, Solicitor
Jeffery S. Dennis, Attorney
FEDERAL ENERGY REGULATORY
   COMMISSION
888 First Street, NE
Washington, D.C. 20426
jeffery.dennis@ferc.gov
(202) 502-6027

EXHIBIT A

121 FERC ¶ 61,270
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION


Before Commissioners:  Joseph T. Kelliher, Chairman;
                       Suedeen G. Kelly, Marc Spitzer,
                       Philip D. Moeller, and Jon Wellinghoff.


AmerenUE                                    Project No.  2277-005


ORDER GRANTING INTERVENTION, DENYING REHEARING, AND
DISMISSING REQUEST FOR STAY

(Issued December 20, 2007)

1.      Missouri Coalition for the Environment, the Sierra Club, and American Rivers (Petitioners) seek intervention and rehearing of an August 15, 2007 letter order authorizing Union Electric Company, doing business as AmerenUE (Ameren), licensee for the Taum Sauk Project No. 2277, to start reconstruction and repair of the project's upper reservoir.  The project is located atop Proffit Mountain and on the East Fork Black River in Reynolds County, Missouri.  Petitioners also request either clarification of the letter order or a stay.  For the reasons discussed below, we grant intervention and deny rehearing.  We also grant in part the request for clarification, and dismiss the stay request as moot.

**Background**

2.      The Commission issued an original license for the Taum Sauk Pumped Storage Project in 1965, with an expiration date of June 30, 2010.[1]  Although Ameren has not yet filed a relicense application, the licensee filed a notice of intent to apply for a new license on February 17, 2005, and is currently involved in pre-application activities required for relicensing.

3.      On December 14, 2005, the Project's upper reservoir breached, rendering the facility inoperable.  The upper reservoir overtopped when the pumps filling it failed to shut off.  Erosion undercut the rockfill dam, creating a breach that emptied the reservoir.  Floodwaters rushed down the west side of Proffit Mountain into the East Fork of the

_____

[1] *Union Electric Co.*, 34 FPC 598 (1965), *modified on rehearing*, 35 FPC 316 (1966).

Black River, destroying the home of the Johnson's Shut-Ins State Park superintendent and endangering his family. Flows flooded motorists on a nearby highway and significantly damaged the State Park, campground, and adjacent properties before entering the Lower Taum Sauk Reservoir. Fortunately, there were no fatalities. After an investigation, the Commission entered into an October 2, 2006 stipulation and consent agreement with Ameren and required the company to pay a $10 million civil penalty, as well as $5 million into an escrow account to fund enhancements at or near the project.[2]

4.      On February 5, 2007, Ameren filed a request to rebuild the upper reservoir. On February 13, 2007, Commission staff issued a notice of intent to prepare an environmental analysis. On February 21, 2007, Commission staff issued a scoping document for the proposed reconstruction, and subsequently held two public scoping meetings near the project on March 12, 2007. Staff released a draft environmental assessment (EA) on June 7, 2007. Petitioners' representatives attended one of the meetings and filed comments on both the scoping document and the draft EA.

5.      Commission staff issued a final EA on August 14, 2007. The EA concluded that the proposed reconstruction, with staff's recommended mitigation measures, would not constitute a major federal action significantly affecting the quality of the human environment. The next day, on August 15, 2007, the Director of the Commission's Office of Energy Projects issued a letter authorizing Ameren to start reconstructing the upper reservoir. On September 14, 2007, Petitioners filed a motion for late intervention and request for rehearing of the Director's letter order. On October 1, 2007, Ameren filed an answer in opposition to the motion for late intervention.

6.      Petitioners seek intervention for the purpose of requesting rehearing. They request that the Commission stay the Director's August 15, 2007 letter order until the Commission issues a supplement to the EA that addresses the cumulative and indirect impacts of the rebuild proceeding, including the reasonably foreseeable impacts caused by the future operation of the project. In the alternative, they request that the Commission amend the letter order to address how Ameren will assure that reconstruction will not interfere with timely relicensing of the project, and to expressly reserve the Commission's authority to require modifications to the facility as part of relicensing. Petitioners also take issue with staff's conclusions in the EA and letter order.

7.       Ameren maintains that Petitioners have not shown they have a right to intervene and participate as a party, and have not demonstrated good cause for their failure to file a timely motion to intervene. Ameren further argues that Petitioners' concerns regarding future relicensing decisions are premature.

---

[2] *AmerenUE*, 117 FERC ¶ 61,001 (2006).

Project No. 2277-005                                                                3

## Discussion

8.      Under rule 713 of the Commission's Rules of Practice and Procedure,[3] only a party to a proceeding may file a request for rehearing. Thus, Petitioners correctly recognize that they may not seek rehearing of the Director's letter order without simultaneously filing a motion to intervene. Although Petitioners filed their request as a motion for late intervention, Commission staff did not establish a deadline for filing motions to intervene in any of the public notices issued in this proceeding. Therefore, Petitioners' motion to intervene was not late, and there was no need for them to establish good cause for late intervention in support of their motion.[4]

9.      In light of the special circumstances surrounding the accident and the level of community interest in the proposed reconstruction, Commission staff determined, and we agree, that public notice of staff's environmental review and public participation in its scoping process was appropriate. Petitioners participated in scoping and filed comments on the draft EA. In addition, Petitioners have participated in the pre-filing phase of the relicensing process for the Taum Sauk Project.[5] Accordingly, we will grant their intervention request and address their arguments on rehearing.

10.     Petitioners argue that the Commission erred in limiting the scope of the EA to the immediate impacts of the proposed reconstruction, without also considering the environmental impacts associated with future operation of the Taum Sauk Project. They argue that, under the National Environmental Policy Act (NEPA), the Commission must disclose all significant impacts from projects, including not only direct impacts but also indirect impacts, which include any impacts that are reasonably foreseeable as a result of the proposed action. Petitioners maintain that the Commission's decision to allow the

---

[3] 18 C.F.R. § 385.713 (2007).

[4] In post-licensing proceedings concerning matters for which entities are given a specific consultation role and no intervention deadline is established, a motion to intervene is timely if it precedes or accompanies a request for rehearing of an order disposing of those matters. *See Pacific Gas & Electric Co.*, 40 FERC ¶ 61,035 at 61,099 and n. 13 (1987). In this case, Petitioners were not given a consultation role and therefore could not demonstrate that they had a right to intervene. Nevertheless, because no deadline was established, their motion was timely, and we may grant it in our discretion.

[5] In that regard, Petitioners point out that, because Commission staff did not establish a separate sub-docket for the rebuild proceeding but instead used the same sub-docket for filings related to both the rebuild and the relicensing proceeding, it was unclear whether these two matters were related or distinct. *See* Petitioners' request for rehearing at 8.

upper reservoir to be rebuilt "will necessarily result in the operation of the project"[6] and that, as a result, issuance of a new license for the project is a reasonably foreseeable future action that must be considered now, rather than later.

11.    Petitioners consider it "inconceivable to think that the Commission would allow a licensee to construct a project and operate it for a single year (or less) only to deny the project a new operating license or issue a license that requires substantially different design or operational requirements."[7]  They regard as "unpersuasive" the Director's statement that authorizing the reconstruction will not affect the Commission's future relicensing decision.[8]  Petitioners therefore conclude that the Commission's NEPA analysis must consider the cumulative impacts of the decision to authorize reconstruction, including the reasonably foreseeable operational impacts that will occur under both the current license and any future license for the project.

12.    Petitioners' arguments are not correct.  As we have explained in previous cases,[9] section 10(c) of the Federal Power Act (FPA)[10] requires a licensee to "maintain the project works in a condition of repair . . . for the efficient operation of said works in the development and transmission of power, [and to] make all necessary renewals and replacements . . . ."  A licensee is responsible for keeping a project safe and operational. Failure to do so will place the licensee at risk of possible enforcement action, or may cause the Commission to regard the licensee's behavior as an implied surrender of the

---

[6] Petitioners' request for rehearing at 9.

[7] *Id.* at 10.

[8] *Id.*

[9] *See, e.g., El Dorado Irrigation District*, 94 FERC ¶ 61,031 at 61,118 n. 14 (2001) (authorizing dam reconstruction work while relicense application was pending and project was operating under annual license); *Citizens Utilities Co.*, 68 FERC ¶ 61,310 at 62,285 (1994) (authorizing dam stabilization and spillway reconstruction at one of the project's five dams while relicense application was pending and removal of that particular dam was at issue in the relicensing proceeding).  In the latter case, the licensee subsequently amended its relicense application and obtained authorization to remove the dam instead of rebuilding it.  *See Citizens Utilities Co.*, 71 FERC ¶ 61,006 (1995), and 78 FERC ¶ 61,214 (1997).

[10] 16 U.S.C. § 803(c) (2000).

license.[11]  These principles are reflected in Article 21 of the license for the Taum Sauk Project.[12]

13.    Unless the Commission determines that circumstances would warrant ceasing operation, a licensee has the right to operate its project in a manner consistent with the terms of the license.  In the normal case, the Commission will ensure that a licensee repairs or replaces damaged project works in a timely manner.  If a licensee has indicated that it will not seek a new license for a project, the Commission may permit the licensee to defer any needed repairs, provided that safety is not an issue and the public interest does not require immediate restoration of the project.[13]  However, if a licensee is applying for a new license, the Commission has permitted the licensee to undertake necessary project repairs prior to a decision on the relicense application in all but extraordinary circumstances.[14]  Thus, Ameren's request to rebuild the upper reservoir

---

[11] *See Southern California Edison Co.*, 106 FERC ¶ 61,212 at P 16 (2004).

[12] Article 21 provides:

> If the Licensee shall cease or suffer essential project property
> to be removed or destroyed or to become unfit for use,
> without replacement, or shall abandon or discontinue good
> faith operation of the project for a period of three years, or
> refuse or neglect to comply with the terms of the license and
> the lawful orders of the Commission mailed to the record
> address to the Licensee or its agent, the Commission will
> deem it to be the intent of the Licensee to surrender the
> license, and not less than 90 days after public notice may in
> its discretion terminate the license.

Article 21, Form L-11, *Terms and Conditions of License for Unconstructed Major Project Affecting the Interests of Interstate or Foreign Commerce* (July 1, 1965), 34 FPC 602 (1965), *incorp'd by ref.*, *Union Electric Co.*, 34 FPC 598, 601 (1965) (Ordering Paragraph C).

[13] *See El Dorado Irrigation District*, 82 FERC ¶ 61,255 at 62,021 (1998) (dismissing complaint and finding that licensee's deferral of project repairs while it was in the process of surrendering its license did not violate the FPA or license terms).

[14] *See Swift Creek Power Co.*, 61 FERC ¶ 61,277 (1992) (staying the effectiveness of a 1981 order authorizing rehabilitation and expansion of a project up for relicensing, finding that, because 11 years later the reconstruction had not yet commenced, it was in the public interest to revisit the matter in the pending relicensing proceeding).

was consistent with the FPA and the terms of its license, and staff properly approved it without requiring that the reconstruction await a decision on relicensing.

14.     Moreover, as staff correctly noted in response to comments on the draft EA,[15] the Director's approval of the dam reconstruction does not prejudice the Commission's decision on the relicense application.  In contrast to a repair application, in a relicense proceeding both the FPA and NEPA require the Commission to examine whether the renewed commitment of a public resource to hydroelectric generation will be best adapted to the comprehensive development of the waterway for beneficial public purposes.[16]  This could involve major changes in project facilities or operation, new environmental measures that may substantially alter project economics, or in rare cases, perhaps even a determination that the project should no longer be used for power generation.[17]  In deciding to proceed with the reconstruction now, Ameren necessarily assumes that risk.  In short, there is no legal or factual basis for concluding, as Petitioners maintain, that relicensing should be considered a reasonably foreseeable consequence of the reconstruction authorization.  Consequently, there is no basis for concluding that the EA was in any way deficient for failing to include in its cumulative effects analysis the effects of future project operation that may result from relicensing.  Staff properly restricted the scope of the EA to the impacts associated with rebuilding the upper reservoir.

15.     Significantly, Petitioners do not assert, either here or in the relicensing proceeding, that the Taum Sauk Project should be decommissioned or that authorizing the reconstruction of the project will preclude the imposition of any particular environmental measure in a new license.  Thus, Petitioners' concerns about the Commission prejudging relicensing are purely theoretical.

16.     Contrary to Petitioners' request, we need not expressly reserve our authority to require changes to the project facilities or operation as part of relicensing.  That authority is inherent in the relicensing process.  There is no presumption, either equitable or legal,

---

[15] *See* Appendix A to the final EA at p. A-2.

[16] *See Yakima Tribes v. FERC*, 746 F.2d 466, 475-77 (9th Cir. 1984), *cert. denied*, 471 U.S. 1116 (1985).

[17] *See City of Tacoma, Washington v. FERC*, 460 F.3d 63, 74 (D.C. Cir. 2006).

20071220-3020 Issued by FERC OSEC 12/20/2007 in Docket#: P-2277-005

against the Commission's requiring such changes in any new license that may be issued for the Taum Sauk Project.[18]

17.     Petitioners argue that the EA fails to provide substantial evidence to justify staff's recommendation that Ameren be allowed to clear 13.2 acres of forest for a staging area to be used during the reconstruction.  Petitioners correctly point out that, in the draft EA, staff found that the clearing and grading of this forested area would cause long-term negative effects on wildlife habitat, and therefore recommended that the licensee not clear this area.  They also point out that the Missouri Department of Natural Resources (Missouri DNR) filed comments in support of staff's recommendation that the area not be cleared.  Petitioners then assert that Commission staff reversed its recommendation in the final EA without providing "any evidence in support of its conclusion."[19]

18.     Petitioners overlook the fact that Commission staff reevaluated this issue in the final EA, not only in response to Ameren's comments, but also taking into account Ameren's July 31, 2007 filing in response to the Missouri DNR's concerns.  As discussed in the final EA, Ameren stated that there are no practical alternatives for the location of this staging area, and staff's recommendation that this area not be cleared would affect plans for providing a safe construction environment.  Ameren further stated that if this staging area were not available, some construction equipment would have to be moved offsite, resulting in increased traffic along public roads, and increased noise and air quality impacts to nearby residences.  Ameren also noted that its dam safety engineering consultants considered the area essential for the safe and efficient reconstruction of the upper reservoir.[20]  In response to the Missouri DNR's concerns about visual impacts of the clearing, Ameren filed a plan that would require grading into the area from east to

---

[18] Petitioners also request that we amend the August 15, 2007 letter order to address how Ameren will assure that reconstruction will not interfere with timely relicensing of the project.  Petitioners do not explain or otherwise address the reasons for their request.  Ameren recently filed its draft license application with the Commission and transmitted it to the stakeholders in the relicensing, requesting their comments within 90 days.  *See* letter to Kimberly Bose, Commission Secretary, from Thomas Hollencamp, Ameren (filed October 17, 2007).  In its correspondence regarding the draft application, Ameren noted that, because of the impacts of the upper reservoir breach, some additional studies will be needed to assess the existing environment and to define environmental resources when the project is back in operation.  *Id.* at 2.  Ameren must file its application for a new license on or before June 30, 2008.  Relicensing is a separate matter from project reconstruction, and any concerns about the timing of relicensing should be raised and considered in that proceeding.

[19] Petitioners' request for rehearing at 13.

[20] Final EA at 71.

west at a gradual slope, thus allowing the use of the space without having a scenic impact on the ridgeline view from Johnson's Shut-Ins State Park and locations along the Ozark Trail.[21]  Commission staff found that, with the 40-50 foot high tree line, this approach would shield the cleared area from view for most of the year.[22]  Staff further found that erosion control measures would minimize soil loss, and that the licensee should be required to mitigate for the loss of forest habitat by developing and implementing a reforestation plan.[23]

19.     As the foregoing discussion demonstrates, Commission staff explained the reasons for changing its recommendation to allow the clearing of the staging area, and analyzed the environmental effects of Ameren's revised proposal.  Nothing more is required under NEPA.  We therefore find that final EA provides substantial evidence in support of staff's recommendation.

20.     Petitioners argue that the final EA fails to justify Commission staff's statement that there is a need for power from the project in the face of competing evidence to the contrary.  Petitioners maintain that the EA simply states that the project generates power for use in the region during periods of peak demand.  They add that, in comments on the draft EA, Missouri Coalition for the Environment pointed out that, shortly after the collapse of the upper reservoir, Ameren announced that it was buying three more power plants that would provide sufficient generating capacity and reserve power to serve its Missouri customers the following summer, even without the Taum Sauk Project.  They criticize the final EA for failing to address this evidence.

21.     The reconstruction of the upper reservoir is not a licensing action under the FPA.  Rather, it is a compliance matter that falls under the Commission's project safety authority under Part 12 of its regulations.[24]  For licensing actions, need for power is one of the many public interest factors that the Commission must consider in determining whether the project should be licensed under FPA section 10(a)(1).  In contrast, the Commission is not required to revisit these section 10(a)(1) factors for post-licensing

---

[21] *Id.* at 69.

[22] *Id.*

[23] *Id.* at 72-73.

[24] *See* 18 C.F.R. Part 12 (2007).  Among other things, Part 12 authorizes the Regional Engineer or other authorized representative of the Commission to require an applicant or licensee to take any action with respect to the design, construction, operation, maintenance, repair, use, or modification of the project or its works that is, in the judgment of that official, either necessary or desirable.  18 C.F.R. § 12.4(b)(2)(iv) (2007).

matters such as project repairs, reconstruction, or compliance filings.[25]  Commission staff was not required to make a finding in the EA that power is needed before recommending that Ameren be allowed to reconstruct the upper reservoir and return the project to service, because these matters are governed by FPA section 10(c) and Article 21 of the existing license.  The Commission will consider whether there is a need for power in the upcoming relicensing proceeding.

22.    Compliance and review actions that do not have a significant effect on the environment are categorically excluded from the requirement to prepare an EA,[26] although the Commission may elect to prepare an environmental analysis for an action that is otherwise categorically excluded from NEPA analysis.[27]  In this case, Commission staff chose to prepare an EA, and followed its usual practice of identifying the purpose and need for the proposed action as part of its analysis.[28]  In a licensing action, need for power and need for the proposed action are closely aligned, because even if a project has multiple purposes, one of them is the generation of electric power.  For reconstruction, however, the purpose and need for the proposed action are different:  the purpose of the action is to authorize the reconstruction, and the action is needed so that the project can resume power generation as provided in the license.  During the term of a license, the Commission would have no basis for revoking it simply because new sources of replacement power had become available.  Similarly, the Commission could not prevent a licensee from repairing its licensed project based on such a showing.  Thus, we conclude that need for power is not relevant in this proceeding.  Accordingly, Commission staff was not required to consider it in the EA, and staff adequately described the purpose and need for the proposed action by stating that rebuilding the Taum Sauk Project would allow project power to again be available in meeting part of the regional need for on-peak power.

23.    Petitioners maintain that, because the August 15, 2007 letter order relies on a flawed EA which was not itself supported by substantial evidence, the letter order also is not supported by substantial evidence.  As we have seen, however, Petitioners' arguments concerning the EA are unfounded.  We therefore find no basis for concluding that the letter order lacks evidentiary support.

---

[25] *See Marysville Hydro Partners*, 62 FERC ¶ 61,011 at 61,041 (1993).

[26] *See* 18 C.F.R. § 380.4(a)(3) (2007).

[27] *See* 18 C.F.R. §380.4(b) (2007).

[28] *See* 40 C.F.R. § 1502.10(d) (2007), which lists "[p]urpose of and need for action" as part of the recommended format of the Council on Environmental Quality (CEQ) for an environmental impact statement (EIS).  Commission staff follows the same CEQ-recommended format in preparing an EA.

Project No. 2277-005                                                        10

The Commission orders:

     (A)  The motion to intervene filed on September 14, 2007, by the Missouri Coalition for the Environment, the Sierra Club, and American Rivers in this proceeding is granted.

     (B)  The request for rehearing filed on September 14, 2007, by the Missouri Coalition for the Environment, the Sierra Club, and American Rivers in this proceeding is denied.

     (C)  The request for a stay of the Director's August 15, 2007 letter order, filed on September 14, 2007, by the Missouri Coalition for the Environment, the Sierra Club, and American Rivers in this proceeding is dismissed as moot.  The alternative request for clarification of the August 15, 2007 letter order is granted to the extent discussed in this order.

By the Commission.

( S E A L )


                    Nathaniel J. Davis, Sr.,
                      Deputy Secretary.

EXHIBIT B

FEDERAL ENERGY REGULATORY COMMISSION
WASHINGTON, D C 20426

OFFICE OF ENERGY PROJECTS

August 15, 2007

In reply refer to:
P-2277
NATDAM No. MO30041

Mr. Thomas L. Hollenkamp
Chief Dam Safety Engineer
Ameren Services
One Ameren Plaza
1901 Chouteau Avenue
St. Louis, MO 63166-6149

RE: Authorization to Proceed with Construction: Taum Sauk Upper Reservoir
Reconstruction

Dear Mr. Hollenkamp:

I hereby authorize Ameren Services to start construction for the Taum Sauk
(Project No. 2277) Upper Reservoir Reconstruction, contingent upon completing
the following items:

1. The submittal, review and approval of the final Quality Control and
   Inspection Program (QCIP) as discussed by our letter dated August 3, 2007.

2. The submittal, review and approval of the final design, plans and
   specifications which reflect the recommendations of the Board of
   Consultants (BOC) and previous Federal Energy Regulatory Commission
   (FERC or Commission) staff's comments on the preliminary design
   submittals. These documents have been discussed and modified on
   numerous occasions, and the final modifications must be agreed upon by
   you, your design consultant, your BOC, and FERC staff. Our review
   comments as discussed in our August 2 and August 3, 2007 letters should
   be addressed in the final design, and the Plans and Specifications.

3. Your submittal and our approval of a plan and schedule for refilling the
   reservoir that satisfies the established engineering and environmental
   criteria.

   Upon awarding the construction contract, we would like to meet with you,
your design consultant, the BOC, and the contractor, to make all parties aware of
FERC's authority in the construction process. Given the critical nature of this
construction with regard to dam safety and public safety, establishing clear lines of

communication prior to construction is essential. We encourage you to obtain all necessary permits as expeditiously as possible.

Commission staff has prepared an environmental assessment (EA) which examined the proposed action as well as staff's alternative. As you know, the draft EA was issued June 7, 2007, for the proposed reconstruction of the upper reservoir, and it was circulated to the public for review and comment. The draft EA was revised in light of comments received, and a final EA was issued August 14, 2007. The final EA is available in the Commission's public files for this proceeding and via eLibrary on FERC.gov.

The final EA identified a potential negative impact to terrestrial and soil resources that could result from clearing and grubbing forested areas for construction staging areas. The deforestation and removal of vegetation in the proposed laydown and staging areas can cause a negative impact to terrestrial resources unless the area is revegetated. Without proper reforestation practices there may be the potential for nuisance or invasive plant species to colonize the area. Reseeding of these areas needs to be done with the goal of restoring the area back to pre-cleared conditions. In order to mitigate for the loss of forest and terrestrial habitat, the final EA recommends that the licensee develop a reforestation plan in consultation with the resource agencies, for Commission approval.

The final EA also indicated that there may be a temporary short-term impact to recreational opportunities during the construction of the upper reservoir. Since the December 2005 failure event, all recreational opportunities at the project have been closed. Although the licensee proposed to keep all recreation amenities closed during construction, there appears to be no reason why a number of the recreational facilities at the lower reservoir cannot be reopened during this period. The final EA stated that limited access to the lower reservoir for fishing, hiking, wildlife viewing, and picnic areas should be available. The final EA recommends that the licensee, in consultation with the resource agencies, should develop a plan, for Commission approval, to provide limited recreational opportunities at the lower reservoir.

Lastly, the final EA recognizes that the licensee and resource agencies are currently completing consultation regarding the wetlands created by leakage from the previous upper reservoir dike and a Flow Management Plan. The final EA recommends that the Flow Management Plan be filed with the Commission for approval to help ensure minimal impacts to resources during construction and refilling periods, and to confirm the results of the licensee's consultation with the resource agencies.

The final EA concluded that the proposed rebuilding of the upper reservoir of the Taum Sauk Project, with staff's recommended mitigation measures, would not constitute a major federal action significantly affecting the quality of the human environment. Enclosed is a list of environmental requirements that are consistent with the recommendations of the final EA and must be complied with during the reconstruction of the upper reservoir.

The authorization for the reconstruction of the upper reservoir is based on the entire record developed by Commission staff, AmerenUE, the independent consultants, and the various entities which have been consulted or have provided comments to the Commission.

Sincerely,

J. Mark Robinson
Director
Office of Energy Projects

Enclosure

Enclosure

Environmental Requirements for the
Taum Sauk Upper Reservoir Reconstruction

Water Quantity and Quality

To minimize effects on reservoir elevations and downstream flow releases under all conditions, AmerenUE (licensee for the Taum Sauk Project) must file a Final Water Management Plan, for Commission approval, within one month of issuance of the final Environmental Assessment (EA). The Final Water Management Plan must address both the construction period and the initial upper reservoir refilling period when water would be drawn from the lower reservoir using the pump/generators. The final plan must identify: (1) all water withdrawals and returns from the lower reservoir and their calculated rates, and expected periods of use; (2) all methods that would be used to release water from the lower reservoir to the East Fork Black River; (3) measures to be taken to ensure that reservoir releases approximate total natural inflows, particularly during low flow periods; (4) water level and release monitoring methods and frequencies to be used during construction and refilling; and (5) the lowest reservoir level at which any type of withdrawals would be allowed to continue. The Final Water Management Plan must also address any seasonal concerns regarding maintenance of water levels and flow releases, such as spawning of recovering fish populations, as necessary.

The Final Water Management Plan must be developed in consultation with the Missouri Department of Conservation (MDOC) and the Missouri Department of Natural Resources (MDNR), and should fully discuss and consider the plan developed by the agencies. The licensee's Final Water Management Plan must include copies of comments from the agencies on a complete draft of the final plan and the licensee's responses to the issues raised by the agencies. Finally, the plan must include a schedule for the reporting of lower reservoir level and flow release information at a frequency determined by the licensee, MDOC, and the MDNR, to the Commission and the MDOC and MDNR. The reports must include explanations of any notable fluctuations shown in the data. Any significant fluctuations must be reported to the Commission within 3 days of occurrence. The final plan must describe conditions that would constitute significant fluctuations that would trigger such reporting.

The Commission retains the right to modify or reject the Final Water Management Plan if it is deficient, does not appear to adequately address or

resolve issues that are raised during consultation with the resource agencies, or would not allow, upon staff review, adequate protection of natural resources. The filing of a deficient or inadequate Final Water Management Plan could result in rejection of the plan and the delay of the start of construction.

## Reforestation / Revegetation

In order to mitigate for the loss of forest and forested habitat in a timely manner, the licensee must develop a reforestation plan in consultation with MDOC, MDNR, U.S. Fish and Wildlife Service (FWS) and the U.S. Forest Service (FS). The plan must be filed with the Commission for approval within one year of issuance of the final EA. The licensee must consult with the resource agencies to determine the proper species, size, age and ratio of species to reseed or plant that are suitable for Proffit Mountain. The plan must evaluate the best use of grasses, bushy vegetation, and multiple species of trees, ideally replanting those species that were cleared, or those species present in the immediate vicinity of the cleared area. The revegetation/reforestation plan must address the following areas: laydown areas 1, 2 and 3, the truck and equipment staging area, the test pad area, areas around the perimeter of the dike, the parking area and the road to the boring location as well as any other area affected by reconstruction. The reforestation plan must also include a monitoring component to assure that the plantings are surviving and whether or not additional plants are needed over time.

The reforestation plan must address the methods for preparing the area post-construction, to assure proper soil conditions are present before seeding and planting, which may include removal or partial removal of hardfill material. The hardfill material present at the staging areas may impede vegetation efforts by inhibiting root stabilization and water permeation. The resource agencies must be consulted to determine the extent to which the hardfill materials need to be removed and the amount of soil replenishment needed. The plan must include any comments from the resource agencies and incorporate the recommendations of the agencies or provide a detailed explanation, based on project specific information, for exclusion of the recommendation.

## Wetlands

Following consultation with the MDNR on springs and wetlands in the project area, the licensee must file with the Commission, within six months of issuance of the final EA, the results of its consultation with the MDNR regarding how it proposes to resolve the concerns of the MDNR surrounding the wetlands created by leakage from the previous upper reservoir. Resolution may include, but is not limited to, determining the extent of mitigation needed, maintaining the existing wetlands or creating/replacing the wetlands.

- 3 -

The FS has expressed an interest in consulting with the licensee to help mitigate the loss of wetland habitat as a result of the proposed action. If consultation between the licensee and the MDNR concludes that mitigation is needed for the loss of wetlands, we encourage the licensee to also consult with the FS for information on potential mitigation enhancements.

Recreation

In order to safely maximize public usage of recreational amenities at the lower reservoir during the construction period, the licensee must file for Commission approval, within 15 days of issuance of the final EA, a plan, developed in consultation with the MDOC and MDNR, that details the specific recreational amenities that will be available to the general public throughout the construction period. Different facilities may be opened or closed at different times of the year. The plan must address updating signage to inform recreational users of any restrictions, including cautionary traffic signage, if necessary. Further, the licensee's recreation plan must allow for any seasonal and annual changes in construction activities that could affect recreation availability and safety. The plan must include any comments from the resource agencies and incorporate the recommendations of the agencies or provide a detailed explanation, based on project specific information, for exclusion of the recommendation.